# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | No. 1:17-cr-00089 |
| v. : | |
| : | (Judge Kane) |
| **MAURICE L. ROSS,** : | |
| **Defendant** : | |

## MEMORANDUM

Before the Court is Defendant Maurice L. Ross ("Defendant")'s motion to suppress evidence under the Fourth and Fifth Amendments to the United States Constitution. (Doc. No. 26.) For the reasons explained below, the Court will deny the motion.

## I. BACKGROUND

### A. Factual Background[1]

#### 1. Robbery Investigation

Detective Jason Paul ("Detective Paul"), who is employed by the Harrisburg City Police Department and presently assigned to the city's vice unit, was assigned to investigate three armed robberies that reportedly took place at the Brookwood Market in Harrisburg, Pennsylvania in December of 2016. (Doc. No. 35 at 6: 6-25, 7: 2-4.) The robberies occurred on December 8, December 17, and December 22 of 2016, respectively. (Id. at 7: 10-25.) During the first robbery, "[a]n armed individual came into the store and robbed the store clerk . . . [and] the only thing that was taken was cash." (Id. at 7: 12-14.) During the second robbery, when the same store clerk was present, the clerk relayed that the same male entered the store with his face covered and displayed a handgun while taking both cash and lottery tickets. (Id. at 7: 18-22.) As

---

[1] Unless otherwise noted, the facts recited herein are derived from the transcript of the suppression hearing held by the Court on October 19, 2017. (Doc. No. 35.)

to the third robbery, which involved a different clerk, "[a] male came in, face covered, displayed a handgun, and during that robbery, cash and lottery tickets were taken." (Id. at 7:23-25, 8:1-2.)

As part of his investigation, Detective Paul received information from the state lottery bureau as to the lottery tickets stolen during the second and third robberies, which ultimately led to Defendant's arrest. (Id. at 8: 24-25, 9: 1-9.) According to Detective Paul, whenever lottery tickets are taken during a robbery, the lottery bureau records the serial numbers of the stolen lottery tickets, "and once somebody tries to cash those tickets, they'll be flagged" such that they cannot be cashed, and the lottery bureau is subsequently notified that an individual attempted to cash the tickets. (Id. at 9: 3-9.) On January 5, 2017, Detective Paul contacted Jim Sawyer ("Sawyer"), an employee of the state lottery bureau, who informed him that "some of the tickets from these robberies had been cashed on December 18th at three different locations," one of which was located within Harrisburg, and another that was "right outside the city at the Sheetz on Paxton Street." (Id. at 9: 10-18.) Upon receiving this information, Detective Paul proceeded to the Sheetz, where employees "were able to pull video of a male coming into the store and cashing the tickets," which allows one "to see the male pull in in a minivan, go in, [and] cash the tickets with the clerk." (Id. at 9: 19-23.) After the male cashed the tickets, he left the Sheetz store in the minivan. (Id. at 10: 1-3.)

Using video security footage, Detective Paul obtained information as to the minivan's license plate, which read "MS CYNT." (Id. at 10: 4-5.) After he "ran the tag," his search returned a result for a woman named Cynthia Hamilton ("Cynthia Hamilton"), whose residence was listed as 2402 Kensington Street in Harrisburg. (Id. at 10: 4-7.) Detective Paul was then able to locate additional information relating to Cynthia Hamilton, which revealed that "she had two sons, a Darryl Ross and a Maurice Ross" who were listed as residing at the same location

2

and both had figures or profiles of the male suspected of committing the robberies. (Id. at 10: 8-11.) Specifically, Detective Paul remarked that "[t]hey were both large black males." (Id. at 10:11.) Additionally, Detective Paul stated that he was already somewhat familiar with Defendant in that he "was aware that he had gone to federal prison." (Id. at 11: 6-7.) Detective Paul then contacted Detective Richard Gibney ("Detective Gibney"), a detective employed by the Harrisburg City Bureau of Police who assists in investigations involving the FBI, who put him in contact with Defendant's federal probation officer, David Herzog ("Herzog").[2] (Id. at 11: 21-23, 13:1-3.) Detective Paul then contacted Herzog on January 6, 2017 to review surveillance footage pertaining to the robberies and ascertain whether Herzog recognized any individual in the footage, and after that review, Herzog stated that he recognized Defendant. (Id. at 12: 1-4, 14: 22-24.)

In addition, Detective Paul assembled photo arrays as to Defendant and Darryl Ross (id. at 10: 12-13), and also on January 6, visited the Sheetz where one had attempted to cash stolen lottery tickets and met with Troy Decker ("Decker"), the manager of the Sheetz who previously showed surveillance footage to him (Id. at 13: 14-16). While meeting with Decker, Detective Paul showed him a photo array containing a picture of Defendant, and Decker identified Defendant as the individual who cashed the lottery tickets. (Id. at 13: 16-19.) Upon being shown a separate photo array that included Darryl Ross' picture, Decker was unable to identify anyone in that array. (Id. at 13: 17-21.) Detective Paul subsequently took the photo arrays to the Brookwood Mart, where he met with the two clerks who were present at Brookwood Mart during the robberies. (Id. at 15: 11-14.) One of the clerks was able to identify Defendant "as the person

---

[2] Detective Paul confirmed that Defendant's probation officer at the time was Herzog, and that the affidavit of probable cause accompanying search warrant used for Defendant's residence incorrectly identified Herzog as "David Rizzo." (Doc. No. 35 at 13: 4-6.)

that robbed him on both occasions," while the other was unable to identify anyone from either array. (Id. at 15: 15-17.)

## 2. Application for and Issuance of Search Warrant

On January 6, 2017, Detective Paul completed an application for a search warrant ("the warrant") for the residence located at 2402 Kensington Street ("the residence"), which was signed by a judge of the Dauphin County Court of Common Pleas. (Id. at 16: 16-22.) The warrant named the aforementioned address and Defendant as the place and person to be searched. (Doc. No. 26, Ex. A.) As to specific articles to be searched for and/or seized, the warrant listed the following items: a silver revolver handgun; a gray drawstring backpack; a gray baseball cap with a black rim; a black hooded sweatshirt; a gray hooded sweatshirt; a black mask; the Pennsylvania lottery tickets that were stolen during the robberies; a Pennsylvania driver's license belonging to a store clerk present during one of the robberies; and a Members First debit card belonging to said clerk. (Id.)

The accompanying affidavit of probable cause ("the affidavit") set forth the factual details of each of the three robberies. (Id.) Additionally, the affidavit described Detective Paul's investigation into the robberies as follows:

> On 01/05/2017 at Approx. 1310 Hrs [Officer] Fustine and I went to the PA lottery building and made contact with Jim Sawyer, Deputy Director of Security. Sawyer provided me with the date, time, and location of cashed lottery tickets that were taken during this robbery. On 12/18/16 at 0940 hrs 7 of the tickets taken in these 2 robberies were cashed at Sheetz store located at 3695 Paxton St. Officer Fustine and I went to this location and were able to view the security footage. We observed the same male from the robberies enter the parking lot in a silver minivan, PA registration MS CYNT, and enter the store. The male entered the store and cashed all of the tickets. The male is then observed exiting the store and departing the store in the same minivan. The registration came back to Cynthia C. Hamilton of 2402 Kensington St. Research was done on this address and we were able to identify her son as Maurice Ross [with a birth date of] 04/23/1982. I made contact with Ross' Federal Parole Agent, Dave [Herzog], and explained to him

4

what had occurred. [Herzog] agreed to meet me at the Sheetz store on 01/07/17 at 0900hrs to view the footage.

(Id. at 2.) Further, the affidavit described the identifications of Defendant made by the Sheetz store clerk who assisted in cashing the subject lottery tickets and one of the store clerks present for two of the robberies, as well as Herzog's identification of Defendant. (Id.) The affidavit also stated that Herzog "confirmed [Defendant's] current address as 2402 Kensington St.," and that Herzog had "made contact with [Defendant] at this address on 01/03/17 for a [p]arole visit," noting that "[a] criminal history check was completed on [Defendant] and it shows 2 prior convictions of [f]irearms [v]iolations." (Id. at 3.)

### 3. Execution of Warrant and Questioning of Defendant

On January 7, 2017 at approximately 6:00 a.m. the Dauphin County Crisis Response Team ("CRT") executed the warrant while accompanied by Detective Paul and additional law enforcement officers (Doc. No. 35 at 16: 23-25, 17: 14-22).[3] The following individuals were inside the residence at the time the warrant was executed: Defendant; Darryl Ross; Cynthia Hamilton; Defendant's sister, Carlita Hamilton ("Carlita Hamilton"); and another female individual who "was downstairs with [Defendant]" when the warrant was executed. (Id. at 18: 6-11.) According to Detective Paul, he entered the premises, explained to the above individuals that there was a warrant for the residence, and then "read everybody their Miranda rights." (Id. at 18: 12-14.) At this time, "everybody was sitting inside, in the living room right inside the door on the couches." (Id. at 18: 14-16.)

While informing them of their Miranda rights from memory (id. at 31: 1-2), Detective Paul "made sure that everybody either gave [him] a verbal yes that they understood or would

---

[3] The CRT executed the warrant because of the "high likelihood" that a gun would be present at the premises being searched. (Id. at 17: 18-22.)

5

shake their head acknowledging [so as to] make sure everybody does acknowledge that [he] read them their rights and they understand their rights" (id. at 18: 17-21). Detective Paul addressed the residents collectively when stating their Miranda rights, explaining that he "said it to everybody" and ensured everyone acknowledged their Miranda rights "with either a shake of the head or a yes response." (Id. at 31: 6-8.) According to Detective Paul, he specifically stated the following:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to an attorney. If you cannot afford an attorney, one will be appointed to you free of charge. At any point in time you can stop answering my questions. Do you understand your rights?

(Id. at 31: 13-18.) In response, Defendant verbally stated "yes," indicating that he acknowledged his Miranda rights (id. at 31: 19-22), while the other individuals present responded with "[e]ither a yes or a nod of the head" (id. at 31: 23-24).[4] Further, Detective Gibney, who accompanied Detective Paul and the CRT during the execution of the warrant, reported that he heard Detective Paul read Miranda rights to everyone in the residence and ask them to acknowledge that their rights had been read to them, and that he specifically heard Defendant acknowledge hearing his rights and understanding them. (Id. at 46: 14-21.)

Furthermore, Detective Paul explained the items to be seized under the warrant, and then "turned to [Defendant] and asked him if there was a gun in the residence," to which Defendant did not respond. (Id. at 18: 22-24.) At that point, Detective Paul told Defendant and the others that if police located any object, including the firearm, then "everybody in the house would be charged." (Id. at 18: 24-25, 19: 1.) Defendant then responded that he did possess a handgun,

---

[4] Noting that he was focused on Defendant for purposes of the execution of the warrant, Detective Paul stated that as to the others in the residence, he was unsure whether they verbally stated yes or nodded their heads, stating that either of the two options was possible. (Id. at 31: 25, 32: 1-10.)

6

which was located in the basement inside a safe, and Defendant acknowledged that the handgun was a revolver. (Id. at 19: 2-4.) After being provided a code to the safe by Defendant, Detective Paul proceeded to the basement with Investigator Lyda, who opened the safe and found no handgun inside it, but rather, "just some bullets." (Id. at 19: 8-12.) Detective Paul returned upstairs, where he again asked Defendant where the gun was located, to which Defendant responded by instructing him "to check his jacket pocket that was downstairs." (Id. at 19: 13-16.) He relayed this information to additional officers in the basement, who subsequently notified Detective Paul "that the handgun had been recovered in the jacket pocket." (Id. at 19: 17-21.)

Detective Paul remarked that during the execution of the warrant, including each exchange between him and Defendant, Defendant was "completely fine at the house" and did not appear to be under the influence of alcohol or any controlled substance. (Id. at 21: 8-12.) As to Darryl Ross, Detective Paul did not consider him to be under the influence, but noted that he had been vomiting at the house while the warrant was being executed, which Darryl Ross explained to the officers by saying that "it was just recently his birthday and he was out the night before partying." (Id. at 21: 15-18.) According to him, no one else at the residence appeared to be ill on the morning of January 7. (Id. at 21: 19-20.) Defendant and Darryl Ross were then both placed under arrest, with Defendant being arrested in relation to the robberies and Darryl Ross being arrested due to outstanding warrants unrelated to this case. (Id. at 21: 25, 22: 1-4.)

### 4. Questioning of Defendant at Police Station

On the morning of January 7, 2017, after Defendant was taken into custody, he was transported to the Harrisburg Police Department, where Detective Paul and Detective Fustine ("Detective Fustine") attempted to speak with him about the robberies and items located during

7

the warrant's execution. While Defendant "admitted the gun was his" at the residence and told law enforcement where it was located, he subsequently indicated at the police station that he did not want to speak with them further about the robberies. (Id. at 22: 8-18.) Detective Paul stated that after he initially read the Miranda rights at the residence, he "did not read them a second time." (Id. at 34: 23-25, 35:1-2.) During the course of this interview, he did not obtain a written waiver of Defendant's Miranda rights, nor did he request that Defendant provide him with a written statement. (Id. at 36: 1-5.) The entire interaction at the police station was both videotaped and audiotaped. (Id. at 35: 8-16.) After it became known that Defendant did not want to communicate with Detective Paul, the interview was terminated. (Id. at 36: 6-7.)

In regard to the videotaped interaction with Defendant at the police station, Detective Paul stated that at the residence, Defendant "seemed more awake and alert," and while he was present at the police station, Defendant "just didn't seem like he was too interested in talking to [him]." (Id. at 38: 25, 39: 1-2.) He stated further that he was unable to say whether Defendant was "sleepy," but noted that "[h]e didn't seem like he really wanted – had an interest in talking to me." (Id. at 39: 7-8.) Additionally, the accompanying report prepared by Detective Paul as to this interview does not indicate that Defendant waived his constitutional rights, nodded his head in acknowledgement of such rights, or understood his rights. (Id. at 42: 24-25; 43: 1-5.)

B.     **Procedural Background**

On March 29, 2017, a federal grand jury returned a nine-count indictment charging defendant with the following offenses: (1) three counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g); (2) three counts of committing armed robbery under 18 U.S.C. § 1951; and (3) three counts of brandishing a firearm in furtherance of a crime of violence pursuant to 18 U.S.C. § 924(c)(1)(A). (Doc. No. 1.) Following the return of the

indictment, an arrest warrant was issued as to Defendant on March 29, 2017 (Doc. No. 5), and Defendant entered a plea of not guilty as to the aforementioned counts on April 11, 2017 (Doc. No. 12). On August 18, 2017, Defendant filed a motion to suppress certain evidence under the Fourth and Fifth Amendments to the United States Constitution. (Doc. No. 26.) The Court held a suppression hearing on October 19, 2017. (Doc. No. 35.) Defendant submitted a brief in support of his motion prior to the hearing. (Doc. No. 27). Following the hearing, the government filed a brief in opposition on January 12, 2018 (Doc. No. 40), and Defendant filed a reply brief on February 26, 2018 (Doc. No. 44).[5] Accordingly, Defendant's motion is ripe for disposition.

## II. LEGAL STANDARD

### A. Sufficiency of the Warrant Under the Fourth Amendment

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. When a search warrant authorizes a search, the proponent of the motion to suppress evidence from the search bears the burden of establishing that his or her Fourth Amendment rights were violated. See United States v. Correa, 653 F.3d 187, 190 (3d Cir. 2011) (citing Rakas v. Illinois, 439 U.S. 128, 132 n.1 (1978)); see also United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995). The challenger must make such a showing by a preponderance of the evidence. United States v. Matlock, 415 U.S. 164, 178 n.14 (1974). At a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be

---

[5] Upon requests from the government, the Court permitted the government additional time to file a brief in opposition to Defendant's motion (Doc. Nos. 36, 37, 38, 39), which it submitted on January 12, 2018 (Doc. No. 40). Defendant then requested, and the Court granted, an extension of time to file a reply brief. (Doc. Nos. 42, 43.) All briefing relevant to Defendant's motion was therefore submitted in a timely manner.

determined by the trial judge." United States v. Richardson, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (citations omitted).

### 1. Affidavit of Probable Cause

Search warrants must be supported by probable cause, which is established when, under the totality of the circumstances, "there is a fair probability that . . . evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). "[P]robable cause can be, and often is, inferred by considering the type of crime, the nature of the [evidence] sought," and inferences about where evidence of the crime may be found. United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001) (internal citations and quotations omitted). Upon a challenge to a probable cause determination, courts apply a deferential standard of review. United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents, 307 F.3d 137, 146 (3d Cir. 2002). This means that "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." Id. at 147 (quoting United States v. Jones, 994 F.2d 1051, 1054 (3d Cir. 1993)). As such, the question before the Court is not whether probable cause actually existed, but instead whether the issuing authority possessed "a substantial basis" for finding probable cause. Id. (internal quotations omitted).

### 2. Good-Faith Exception to the Exclusionary Rule

Where a warrant is defective or lacks probable cause, evidence from the search will not be suppressed when the officers who executed the search warrant acted in "objectively reasonable reliance" on the lawfulness of the warrant. United States v. Leon, 468 U.S. 897, 925 (1984); see also United States v. Franz, 772 F.3d 134, 145 (3d Cir. 2014) (quoting Davis v. United States, 564 U.S. 229, 238 (2011)) (stating suppression is unwarranted "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their

conduct involves only simple, isolated negligence"). This exception to the exclusionary rule applies unless a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization. See United States v. Loy, 191 F.3d 360, 367 (3d Cir. 1999). Courts have identified four situations where reliance on a signed search warrant would not be "in good faith:" (1) when the issuing magistrate "was misled by information in an affidavit that the affiant knew was false;" (2) when "the issuing magistrate wholly abandoned [his or her] judicial role;" (3) when the affidavit in support of the warrant is "so lacking in the indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) when the warrant is so "facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably believe it was valid." Leon, 468 U.S. at 922-23. In those circumstances, a reasonable officer should not conduct a search, even where a signed search warrant authorizes one, and evidence uncovered in such a search will be suppressed. See id.

### B. Waiver of Miranda Rights

The Fifth Amendment to the United States Constitution contains an individual privilege against self-incrimination, and Miranda warnings provide a mechanism for safeguarding that privilege. See Miranda v. Arizona, 384 U.S. 436, 467 (1966) ("In order . . . to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored."). Before interrogation, the accused must be fully informed of the "State's intention to use his statements to secure a conviction." See Moran v. Burbine, 475 U.S. 412, 420 (1986). The accused must also be made aware of his rights to remain silent and to have counsel present if he so desires. See Miranda, 384 U.S. at 469. An accused may waive his or her rights verbally or in

writing, so long as the waiver is the product of "a deliberate choice to relinquish the protection those rights afford." United States v. Whiteford, 676 F.3d 348, 362 (3d Cir. 2012) (quoting Berghuis v. Thompkins, 560 U.S. 370, 385 (2010)).

When the issue of waiver arises on a motion to suppress evidence, the prosecution bears the burden of establishing that one's waiver of Fifth Amendment rights was made knowingly and voluntarily. See United States v. Crook, 502 F.2d 1378, 1381 (3d Cir. 1974). A court will first determine whether "the relinquishment of the right [was] voluntary in the sense that it was the product of a free and deliberate choice," and whether the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran, 475 U.S. at 421. "The ultimate question in the voluntariness calculus is 'whether, under the totality of the circumstances, the challenged confession or statement was obtained in a manner compatible with the requirements of the Constitution.'" Fahy v. Horn, 516 F.3d 169, 194 (3d Cir. 2008) (quoting Miller v. Fenton, 474 U.S. 104, 112 (1985)).

## III. DISCUSSION

Defendant moves for suppression of six (6) items of evidence: (1) an identification of Defendant by Herzog; (2) an identification of Defendant by Decker; (3) an identification of Defendant by one of the clerks employed by the Brookwood Mart and present during two of the robberies; (4) evidence obtained pursuant to the warrant; (5) the statements made by Defendant at the residence; and (6) the statements made by Defendant in the course of his interview with law enforcement at the police station following his arrest. (Doc. No. 26.) As explained at the suppression hearing, the government does not intend to introduce the above identifications at trial (Doc. No. 35 at 3-4), and accordingly, Defendant's challenges to the introduction of such evidence at trial are moot. Therefore, the Court addresses Defendant's motion to suppress only

as to evidence obtained pursuant to the execution of the search warrant and Defendant's statements made at the residence and the police station.

>	A.	**Sufficiency of the Warrant and Applicability of the Good-Faith Exception**

>>	1.	**Arguments of the Parties**

In support of his motion to suppress evidence seized at the residence based on the adequacy of the warrant, Defendant asserts that the affidavit lacks "any statement as to why the affiant believes that evidence or contraband will be found" at the residence, but rather, "simply recites the pertinent facts of the robberies" and "does not even contain an averment by the [a]ffiant that he believes that evidence and/or contraband will be found in Defendant's residence." (Doc. No. 27 at 7.) Additionally, Defendant states that the information contained in the affidavit is stale because the last robbery occurred on December 22, 2016, while the application for the warrant "was not made until 15 days later" on January 6, 2017. (Id. at 7-8.) According to Defendant, "[t]here was nothing offered in the [a]ffidavit . . . to show why either items used in the robberies, or in the proceeds of the robberies, would still be in the residence to be searched more than 2 weeks after the last crime occurred." (Id. at 8.) Further, citing the warrant's reference to Defendant's two prior convictions for firearm offenses, Defendant states that "[c]riminal history alone is not enough to support a finding of probable cause." (Id.) Lastly, Defendant maintains that the good-faith exception to the exclusionary rule is inapplicable because "no reasonable law enforcement officer could have believed the warrant was based upon probable cause." (Id. at 9.)

In opposition, the government contends that the affidavit "clearly explained the substantial evidence pointing to [Defendant] as the perpetrator of the three armed robberies and why evidence would be found at [the residence]" (Doc. No. 40 at 12), and that the information in

13

the affidavit was not stale in light of "the course of ongoing criminality . . . and the nature of the crime and the type of evidence" (id.). Additionally, the government states that the warrant satisfies the particularity requirement by providing "both the address and [Defendant's] name and the explicit list of items to be searched for and seized." (Id. at 12-13.) Further, the government asserts that even if the Court finds that the warrant was insufficient, the evidence seized pursuant to the warrant should be admitted based on the application of the good faith exception to the exclusionary rule. (Id. at 13.)

### 2. Whether the Issuing Authority had a Substantial Basis for Concluding that the Warrant was Supported by Probable Cause

The Court concludes that the affidavit established the existence of probable cause to support the issuance of the warrant. As an initial matter, the Court notes that its review of the issuing authority's determination as to probable cause is deferential, and, consequently, this Court "must determine only that the magistrate judge had a 'substantial basis' for concluding that probable cause existed to uphold the warrant." See United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000) (citing Gates, 462 U.S. at 238). Additionally, in ascertaining the existence of a substantial basis for probable cause, the Court "must keep in mind the judge's task in authorizing search warrants," which is to "make a practical commonsense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." See id. (citing Gates, 462 U.S. at 238).

Cognizant of such considerations, the Court concludes that the issuing authority had a substantial basis for finding that the warrant was supported by probable cause. The affidavit provides a detailed description of specific items the suspect was wearing during the course of the three robberies, which was supported by security footage and accounts from the store clerks present during the robberies. (Doc. No. 26, Ex. A at 2.) The affidavit also explains the steps

taken by Detectives Fustine and Paul to locate the address associated with the minivan depicted in the security footage, which in turn allowed them to identify Defendant through Herzog. (Id. at 2-3.) Accordingly, the Court concludes that the issuing authority had a substantial basis for concluding that evidence related to the robberies would be found at the residence. See, e.g., Whitner, 219 F.3d at 296 ("To uphold the magistrate judge's probable cause determination, we must determine only that the judge had a substantial basis for finding that . . . evidence would be found in [the location searched]."). [6]

Moreover, the Court finds that the information contained in the affidavit was not stale. The approximate fifteen-day period between the last robbery and the submission of the affidavit does not render the information in the affidavit stale in light of the alleged crime – a group of three armed robberies – that was being investigated. See United States v. Urban, 404 F.3d 754, 774 (3d Cir. 2005) ("[W]here the facts adduced to support probable cause describe a course or pattern of ongoing and continuous criminality, the passage of time between the occurrence of the facts set forth in the affidavit and the submission of the affidavit itself loses significance."); United States v. Coles, 264 F. Supp. 3d 667, 680 (M.D. Pa. 2017) (quoting United States v. Gallo, 110 F. App'x 265, 268-69 (3d Cir. 2004)) (noting that "the Third Circuit has observed that 'intervals of weeks or months' between the acts described and the warrant application may not necessarily render evidence stale when other variables support a finding of probable cause"). Accordingly, Defendant's motion will be denied as to evidence seized pursuant to the warrant.

### B. Defendant's Waiver of Miranda Rights

#### 1. Arguments of the Parties

---

[6] Because the Court agrees with the issuing authority's determination that the warrant was appropriately supported by probable cause, the Court will not address the applicability of the good-faith exception to the exclusionary rule.

As to his motion to suppress his statements to law enforcement, Defendant states that upon being taken into custody when the warrant was executed at the residence, he was questioned by law enforcement, "[a]lthough Defendant did not waive, nor was he read, Miranda warnings." (Doc. No. 27 at 11.) During the course of this questioning, Defendant allegedly "made incriminating statements, including describing the location of a gun, and acknowledging ownership [of the gun]." (Id.) Additionally, according to Defendant, after he was transported to the police station subsequent to his arrest, he was questioned again by police, yet before being questioned at the police station, Defendant "did not waive any constitutional rights, nor was he advised of any." (Id.) Moreover, while he was questioned by police, "Defendant was high and sleepy" and at times, "unable to participate in the questioning." (Id.) According to Defendant, suppression is thus warranted because the government cannot establish that Defendant was provided Miranda warnings, or that he knowingly and voluntarily waived his Miranda rights.[7] (Id. at 13.)

Conversely, the government argues that the totality of the circumstances surrounding Defendant's questioning at the residence establishes that Defendant "was advised of and knowingly and voluntarily waived his Miranda rights," as Detective Paul "provided those rights to everyone seated in front of him"; Detective Gibney "heard that advice of rights"; both Detectives Paul and Gibney heard Defendant "verbally acknowledge hearing and understanding his rights"; and there was nothing to suggest Defendant was intoxicated at the time he spoke to

---

[7] In his reply brief, Defendant makes an additional argument that the statements made by Defendant at the residence were not voluntary because when Defendant was initially questioned at the residence as to the location of the gun, "Defendant remained silent" and subsequently, he "was threatened that if he did not tell [law enforcement] where the gun was, and police searched and found a firearm, all the other members of his family who were present . . . would be arrested." (Doc. No. 44 at 5.) Defendant thus maintains that this interaction between Defendant and the officers executing the warrant establishes that any waiver of Defendant's Miranda rights was involuntary. (Id. at 5-6.)

16

police. (Doc. No. 40 at 16.) Further, the government contends that Defendant directed officers to the safe – in which they could search for the gun – and provided them the combination to the safe, prior to directing them to the jacket in which the gun was located. (Id. at 17.) The government also states that the only testimony in contradiction to that of the detectives was provided by Darryl Ross, who "clearly was ill" at the time and "has a clear bias in favor of his brother." (Id.) According to the government, Darryl Ross' testimony as to whether Miranda warnings were given at the residence should be disregarded in light of the testimony provided by Detectives Paul and Gibney, "neither of whom appeared ill or under the influence of drugs." (Id.)

As to the subsequent statements made by Defendant at the police station, the government asserts that Defendant's argument that suppression is warranted "because his rights were not read to him a second time prior to questioning" is meritless, as courts have rejected the view that "Miranda warnings given by an officer of one agency need to be repeated before questioning by another agency," but rather, employ a "totality of the circumstances approach." (Id. at 18.) According to the government, "[t]he totality of the circumstances here suggest that the advice of rights given by Detective Paul at the house was adequate" in that the initial questioning occurred "shortly after 6:00 a.m. and the questioning at the police station occurred less than three hours later by the same officer" (id. at 19), and, therefore, "[i]t was highly unlikely [Defendant] forgot his rights in that time" (id.).

### 2. Whether Defendant Knowingly and Voluntarily Waived His Miranda Rights

The Court concludes that suppression of statements made by Defendant to law enforcement at the residence is unwarranted because Defendant knowingly and voluntarily waived his Miranda rights when he made those statements. As an initial matter, Detective Paul

17

and Detective Gibney testified that Defendant was provided with a verbal Miranda warning, and that Defendant acknowledged such. (Doc. No. 35 at 31: 19-22, 46: 14-21.) Although Defendant asserts that he was "high and sleepy," both Detectives Paul and Gibney testified that Defendant did not appear intoxicated while being questioned at the residence. (Id. at 21: 8-12, 49: 17-19.) Further, Defendant offered information as to the location of the gun, instructing the officers executing the warrant to look for the gun in the safe, and subsequently telling them to look for it in a jacket. (Id. at 58: 24-25, 59: 1-4.) Although Detective Paul reportedly told Defendant and the other individuals present in the residence during the execution of the warrant that if police located any items, including the firearm, "that everybody in the house would be charged," (id. at 18: 22-25, 19:1), the Court is unpersuaded that such a statement from a law enforcement officer would render Defendant's waiver involuntary. In viewing the totality of the circumstances, the Court concludes that nothing in the record indicates that while at the residence, Defendant was incapable of understanding his rights "or the consequences of the decision to waive his Miranda rights." See United States v. Augusta, No. 16-cr-00082, 2018 WL 317972, at *5 (M.D. Pa. Jan. 8, 2018) (stating that record was devoid of any indication that defendant was incapable of understanding his Miranda rights or the implication of waiving them).

The Court reaches a similar conclusion as to the knowing and voluntary nature of a waiver by Defendant with regard to statements he made while being interviewed by law enforcement at the police station. As stated supra, Detectives Paul and Gibney both testified that Defendant was informed of his Miranda rights and acknowledged them at the residence. (Doc. No. 35 at 31: 19-22, 46: 14-21.) While Detective Paul acknowledged that Defendant was not read his rights a second time at the police station (id. at 24: 23-25, 35: 1-2), the Court concludes that upon consideration of the collective circumstances surrounding Defendant's initial

18

questioning and his subsequent questioning at the police station, the interviewing officers were not required to provide an additional <u>Miranda</u> warning to Defendant, as he would not have forgotten "the rights of which he had been advised and which he had understood moments before." <u>See</u> <u>Wyrick v. Fields</u>, 459 U.S. 42, 49 (1982) (noting that adoption of a per se rule requiring additional <u>Miranda</u> warnings in such circumstances would impose "an unjustifiable restriction on reasonable police questioning"). Accordingly, Defendant's motion will be denied as to his statements made to law enforcement at the police station.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion will be denied in its entirety. An appropriate Order follows.

s/ Yvette Kane<br>
Yvette Kane, District Judge<br>
United States District Court<br>
Middle District of Pennsylvania